UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARNELL HUNNICUTT | : |
| | : |
| v. | : CIV. NO. 3:07CV1422 (HBF) |
| | : |
| LEO ARNONE[1], | : |
| WAYNE CHOINSKI, | : |
| JEFFREY MCGILL, | : |
| MARK DONAHUE and | : |
| LUIS COLON | : |

BENCH RULING

Plaintiff Carnell Hunnicutt, Sr. brings this civil rights action against employees of the Connecticut Department of Correction ("DOC") pursuant to 42 U.S.C. §1983, claiming that defendants unlawfully censored his outgoing mail both by refusing to deliver a letter and cartoon and then confiscating the cartoon in violation of his First Amendment rights under the United States Constitution. Plaintiff challenges defendants' actions and Connecticut Department of Correction Administrative Directive §10.7 as applied. Plaintiff seeks injunctive and declaratory relief in addition to an award of nominal and punitive damages.[2]

_____

[1]Former Commissioner Theresa Lantz was removed as a defendant by operation of law and replaced by current Commissioner Leo Arnone. Commissioner Arnone is sued in his official capacity only. Defendants Choinski, McGill, Donahue and Colon are sued in their individual and official capacities.

[2]Plaintiff seeks injunctive relief by Court order returning the cartoon and allowing him to mail it out. Plaintiff also seeks declaratory relief "allow[ing] him to mail out similar non-threatening cartoons in the future." [Doc. #106 at 15]. "Plaintiff seeks nominal damages . . . and $5,000 in punitive

A bench trial was held August 30, 2010. Closing arguments were held on September 14, 2010.[3]

Testimony and evidence adduced at the trial are summarized below as necessary to explain the Court's preliminary findings and conclusions.

## I.   FINDINGS OF FACT

Based on the credible testimony, the exhibits, and the entire record developed during the trial on August 30, 2010, the Court finds the following facts established.

### STIPULATIONS OF FACT

1.   Plaintiff Carnell Hunnicutt, Sr. is sentenced to the custody of the Commissioner of the Connecticut Department of Correction. At all times relevant to this case, plaintiff was housed at Northern Correctional Institution in Somers, Connecticut. [Doc. #101, Stip. ¶1, (hereinafter "Stip.")].

2.   Defendant Leo Arnone is the Commissioner of the Department of Correction and is responsible for administering and approving all Administrative Directives. [Stip. ¶2].

3.   Defendant Wayne Choinski at all times relevant to this case was the District Administrator for the Northern Region of

---

damages from each defendant found liable, along with injunctive and declaratory relief." Id.

[3]The official transcript was filed on September 29, 2010. [Doc. #110, hereinafter cited as "Tr."]. A decision was delayed while plaintiff attempted to settle this and other cases with the Department of Correction.  On September 27, 2012, it was reported that those efforts were unsuccessful.

the Department of Correction. [Stip. ¶3].

4.    Defendant Jeffrey McGill at all times relevant to this case was the Warden at Northern and acting under color of state law. [Stip. ¶4].

5.    Defendant Mark Donahue at all times relevant to this case was the Intelligence Coordinator at Northern and acted under color of state law.  [Stip. ¶5].

6.    Defendant Luis Colon at all times relevant to this case was an Intelligence Officer at Northern and acting under color of state law.  [Stip. ¶6].

7.    On or about March 16, 2007, plaintiff drew a fictional cartoon ("the cartoon") in response to a radio show.  [Stip. ¶7].

8.    Plaintiff addressed an envelope to Jenny Boom-Boom at Hot 93.7 with his name on the return address. [Stip. ¶8]. Jenny Boom-Boom is the on-air name for a radio personality/disc jockey at Hot 93.7.

9.    Plaintiff's cellmate Willie Batts drafted an accompanying letter on behalf of plaintiff and himself. [Stip. ¶9].

10.   In that letter, Willie Batts wrote,

> Hey my celly and I are fans of your show we
> listen to you daily & you seem to have a
> great sense of humor and a "very sexy voice."
> Enclosed is a personal comic for you done for
> humor purposes only. We don't mean to offend
> you in any way, shape or form. We are not
> sexually harassing you or stalking you by any
> cost.  We did this comic in a form of
> flattery and a joken [sic] kinda way.  My
> celly's name is: Hunnicutt, a.k.a. The Mad
> Cartoonist & mine is: Willie, a.k.a Brown
> Eyez b.k.a. The Pornstar, we're both very

3

> respectful men just doing something with our
> time nothing more.  If you enjoy the cartoon
> please let us know we'll do part II along
> with anything else you want. But until pen-
> meet-paper again stay beautiful, sexy & at
> Hot 93.7 to make our day at 2:00PM every day.
> Song: Requested: My Neck, My Back (Lick it)
> By Khia. We'll be listen [sic]"

[Stip. ¶10; Pl. Ex. 3].

11.   On March 18, 2007, the cartoon and letter were placed into
      an envelope, [Pl. Ex. 2], and the envelope was placed into
      an institutional mailbox for delivery to Jenny Boom-Boom.
      [Stip. ¶11].

12.   In the following days, the envelope was delivered to the
      mail room at 34 Walker Drive, then picked up and transported
      back to the intelligence office at Northern.  [Stip. ¶12].

13.   Defendant Colon, Correctional Officer Robert Lovett, and
      defendant Donahue worked in the intelligence office and were
      supervised by defendant McGill in March 2007.  [Stip. ¶13].

14.   Decisions about whether to reject outgoing mail could be
      made, and often were made, independently by each of the
      defendants.  Whenever one of the defendants could not arrive
      at a final decision, he made a recommendation and sent it up
      the chain of command. Final authority rested with the
      Commissioner.  [Stip. ¶14].

15.   At all times relevant to this case, Connecticut Department
      of Correction Administrative Directive 10.7(4)(E)(1) states,
      in pertinent part, that,

> All outgoing general correspondence
> shall be subject to being read at
> the direction of the Unit

> Administrator, by person(s)
> designated in writing by such
> Administrator, for either a
> specific inmate(s) or on a random
> basis if the Commissioner or Unit
> Administrator has reason to believe
> that such reading is generally
> necessary to further the
> substantial interests of security,
> order or rehabilitation.  Outgoing
> general correspondence may be
> restricted, confiscated, returned
> to the inmate, retained for further
> investigation, referred for
> disciplinary proceedings or
> forwarded to law enforcement
> officials, if such review discloses
> correspondence or materials which
> contain or concern . . . (h) mail
> which attempts to forward
> unauthorized correspondence for
> another inmate or; (i) threats to
> the safety or security of staff,
> other inmates or the public.

[Stip. ¶15; Pl. Ex. 5].

16. At all times relevant to this case, Connecticut Department
    of Correction Administrative Directive 10.7(4)(E)(1)
    provided that, "the initial decision to take any action
    provided for in Section (4)(E)(1) except to read, which
    shall be at the discretion of the Unit Administrator, shall
    be made by the designee of the Unit Administrator.  Such
    designee shall not be the same person who made the initial
    mailroom review."   [Stip. ¶16; Pl. Ex. 5].

17. At all times relevant to this case, Connecticut Department
    of Correction Administrative Directive 10.7(4)(E)(3)
    directed that, "Any restrictions imposed on outgoing general
    correspondence shall be unrelated to the suppression of
    expression and may not be restricted solely based on

unwelcome or unflattering opinions or factually inaccurate statements." [Stip. ¶17; Pl. Ex. 5].

18. Defendants maintain a list of people to whom particular inmates are not allowed to write, including former victims and witnesses.  Carnell Hunnicutt was not prohibited from writing to Jenny Boom-Boom.  [Stip. ¶18].

19. Defendant Colon opened the envelope, which he noticed was addressed to Jenny Boom-Boom at Hot 93.7, and read the cartoon and the letter.  [Stip. ¶19].

20. Defendant Colon wanted to reject the cartoon because he disapproved of the erotic and social content of the cartoon, which he found offensive.  [Stip. ¶20].

21. Defendant Colon approached his colleague Robert Lovett, pointed out the sex scenes, and asked what he should do. Lovett told defendant Colon that it was a grey area and that he should take the cartoon to defendant Donahue.  [Stip. ¶21].

22. Defendant Colon did not show Robert Lovett the letter accompanying the cartoon.  [Stip. ¶22].

23. Defendant Colon then showed the cartoon to defendant Donahue.  [Stip. ¶23].

24. Before rejecting the cartoon, somebody brought the cartoon to the attention of defendant McGill, who in turn brought the cartoon to the attention of defendant Choinski; everyone agreed that delivery of the cartoon should be rejected because of the content. [Stip. ¶24].

25. Defendant McGill agreed that delivery of the cartoon should be rejected because of the erotic and social content, which he deemed offensive.  [Stip. ¶25].

26. Defendant Choinski agreed that delivery of the cartoon should be rejected because of the erotic and social content, which he deemed offensive.  [Stip. ¶26].

27. The Commissioner of the Department of Correction approved and administered a custom or policy that staff should reject outgoing mail that Department staff believed may *offend* members of the public. [Stip. ¶27].

28. On or about March 22, 2007, plaintiff received a notice from defendant Colon stating that the cartoon had been rejected. [Stip. ¶28].

29. Defendant Colon indicated on the rejection notice that the letter was not rejected because there was unauthorized enclosure, discussion of criminal activity, or an unauthorized correspondent, but for some other reason. [Stip. ¶29].

30. The other reason was that "the drawing was threatening in nature" and that the plaintiff violated A.D. 10.7 by "sending a letter from I/M Batts. Free postage envelopes must contained [sic] letters from the approved indigent inmate." [Stip. ¶30].

31. Plaintiff was never issued a disciplinary report for threatening - or any other reason - on account of trying to send the cartoon. [Stip. ¶31].

7

32. Plaintiff was never referred to the state police or any other law enforcement agency for attempting to threaten a member of the public.  [Stip. ¶32].

33. At all times relevant to this case, Connecticut Department of Correction Administrative Directive 9.6(5)(F) stated that, "The Unit Administrator shall ensure that no employee who is the subject of an investigation shall investigate or participate in the resolution of an administrative remedy." [Stip. ¶33; Pl. Ex. 6].

34. At all times relevant to this case, Connecticut Department of Correction Administrative Directive 9.6(6)(A) stated that, "An inmate must attempt to seek informal resolution prior to filing an inmate grievance."  [Stip. ¶34; Pl. Ex. 6].

35. Plaintiff sent an inmate request form to defendant McGill, asking him to resolve the issue. [Stip. ¶35].

36. Plaintiff appealed the confiscation and censoring of his cartoon through the official grievance procedure to defendant McGill, the Level 1 grievance reviewer.  [Stip. ¶36].

37. Notwithstanding the fact that his own rejection of the cartoon was the subject of the grievance, defendant McGill denied plaintiff's grievance on the ground that plaintiff's "outgoing general correspondence has been determined inappropriate."  [Stip. ¶37].

38. Plaintiff appealed defendant McGill's decision to Wayne

Choinski, who served as the Level 2 grievance reviewer.
[Stip. ¶38].

39. Notwithstanding the fact that his own rejection of the
cartoon was the subject of the grievance, Wayne Choinski
denied plaintiff's grievance, stating that

> the so-called cartoons are indeed threatening
> in nature.  They are intended to frighten,
> demean, degrade and harass women, and they
> create a sexually offensive and hostile
> working environment for all staff who are
> involved in reviewing these materials.  The
> DOC has a duty to protect the public from
> such offensive and threatening materials and
> confiscation of your materials furthers this
> legitimate public safety goal.  [

Stip. ¶39; Pl. Ex. 14].

40. By May 15, 2007, plaintiff exhausted the prison grievance
procedure with regards to the rejection and confiscation of
the cartoon.  [Stip. ¶40; Pl. Ex. 14].

41. Defendants confiscated the cartoon because they didn't want
plaintiff to try to send it again, for the same reason that
they originally rejected it.  [Stip. ¶41].

REVIEW OF EVIDENCE

Defendant Luis Colon

Defendant Luis Colon has worked for the Department of
Correction since 1993 and was working in the Intelligence Unit at
Northern in March 2007. [Tr. 4]. His responsibilities included
reviewing incoming and outgoing inmate correspondence.  He
testified that mail review is guided by Administrative Directive
10.7. [Tr. 5, 37].

Colon testified that plaintiff was on mail review status in

9

March 2007 when plaintiff deposited an envelope addressed to Jenny Boom-Boom in the outgoing mail at Northern. [Tr. 8]. Hunnicutt was placed on mail review status in February 2007 on Colon's recommendation, which was approved by Warden McGill. [Tr. 8].

Colon explained that Hunnicutt's envelope was opened because plaintiff was on mail review status. [Tr. 10-12, 14]. He testified that the Intelligence Unit does not monitor or restrict outgoing mail that is addressed to a radio station or specifically to Jenny Boom-Boom when an inmate is not on mail review status. [Tr. 14]. They do not reject outgoing mail based the identity of the addressee unless the inmate is specifically prohibited from writing to that person. [Tr. 14].

Exhibit 1, the cartoon at issue, is entitled "Jenny 'Boom-Boom' In Da Club" "By The Mad Cartoonist & Brown Eyes".[4] It consists of twelve hand drawn frames with six frames on page one and six frames on page 2. The written content includes the following:

Frame 1: Jenny Boom-Boom "Hey Fellas, what are you doing in those jumpsuits?" Inmate #1: "Well, Jenny . . . we escaped outta Northern to meet you in person." Inmate #2, "Yeah."

---

[4]Inmate #1 is drawn with glasses. Inmate #2 is drawn clean shaven and taller than Inmate #1. Inmates #1 and #2 are depicted wearing jumpsuits and are not identified by name in the cartoon or in Batt's letter. [Pl. Ex. 3]. Hunnicutt testified that Inmate #1 was drawn in his likeness. Question, "And am I right that in the second panel of the cartoon you're actually portraying yourself slobbering like a dog?" Answer, "Yes." [Tr. 155].

Frame #2: Jenny Boom-Boom "You mean to tell me that you two escaped just to meet me? I can't put this on the air." Inmate #2 "Yeah, my man has been down 12 years and was dying to meet you so here we are." Inmate #1 "Drool Slobber" .

Frame 3: Jenny Boom-Boom "Well guys. Let  me put my microphone away." Inmate #2 "Hot! Hot! Hot!" Inmate #1 "Good Googly Moogly! That ass is juicy!"

Frame 4: Jenny Boom-Boom "Jeez! Is this what they mean when they say hard time?" Inmate #2 "We heard you have an oral fixation. Shwing!" Jenny Boom-Boom "Yeah I do."

Frame 5: Jenny Boom-Boom "Meet me in the back for this! Pow!" Inmate #1 "Oh my God!"

Frame 6: Inmate #1 "My heart . . . " Jenny Boom-Boom "And this!" "Boom! Boom! Clap! Clap!"

Frame 7: Title "Later in the backroom . . ." Jenny Boom-Boom "Okay boys Jenny is gonna lower the "boom" on you!" Inmate #2 "Yum milk." Inmate #1 "Vulva nectar" "Smack!"

Frame 8: Jenny Boom-Boom "Oh my! You guys are working it!" Inmate #2 "Slurp slurp" Inmate #1 "Lap lap lick lap" "Yum yum"

Frame 9: Inmate #1 "Oh Jenny I love you" Jenny Boom-Boom "Let me get my oral affixation on!" Inmate #2 "My toes are curling!"

Frame 10: Jenny Boom-Boom "Save your loads for me." Inmate #2 "Holy Shit! I'm coming! I'm coming"

Frame 11: Jenny Boom-Boom "Beautiful" "Grunt! Squirt!

11

Spurt! Ahhh!"

Frame 12 Inmate #1 "Sorry to hit and run, Jenny, But we gotta get back before count time. We'll treasure this experience forever! We'll listen to you on Hot 93.7" Jenny Boom-Boom "Bye fellas. Come see me once you get out!" [Pl. Ex. 1; Tr. 16-21].

The cartoon depicts "Jenny Boom-Boom" and Inmates #1 and #2 partially nude in frames 5 and 6 and fully nude in frames 7 through 12. The inmates' penes are drawn as sexually aroused  and depicted engaging in sex acts with Jenny Boom-Boom simultaneously. All three are engaging in oral, anal and/or vaginal sex in frames 7 through 11. In frame 11, Jenny Boom-Boom is shown in close up with two penes ejaculating on her face. [Pl. Ex. 1].

Colon was asked, "And so despite the fact that no physical assault was portrayed in the cartoon, nobody portrayed in the cartoon makes another person do something they don't want to do, and nobody is portrayed as unhappy in the cartoon, you believe that the particular sex acts portrayed in the cartoon were sexually threatening; is that correct?" He responded, "They were threatening in nature." [Tr. 22]. Colon stated, "We believe that [the cartoon] was threatening in nature because it could cause mental anguish, or physical or mental issues to the receiver." [Tr. 23].

After inspecting the letter and cartoon, Colon brought the cartoon to his supervisor, Captain Donahue, for review of Colon's initial decision to confiscate the mailing. [Tr. 24, 27]. Captain

Donahue agreed with Colon that the cartoon and letter should be rejected from the outgoing mail.   [Tr. 24, 40].

Colon sent Hunnicutt a "Returned Letter or Funds Notification" form for "Outgoing: Jenny Boom-Boom" correspondence. [Pl. 4]. Colon wrote in the comments section of the form, "Content is rejected under A.D. 10.7. Drawings are threatening in nature. I/M [Hunnicutt] also violating 10.7 by sending a letter from I/M Batts #329751. Free postage envelopes must contain[] letters from the approved indigent inmate." [Pl. Ex. 4; Tr. 41].

Colon testified that the contents of Hunnicutt's envelope were in violation of the Administrative Directive because an inmate cannot include another inmate's correspondence in the same envelope.  William Batts wrote the letter. Hunnicutt drew the cartoon and Hunnicutt was the [return] addressee on the envelope. [Tr. 37-38].

Colon testified that Captain Donahue made the "ultimate determination to reject the mail." [Tr. 40].  "Inmate Hunnicutt was the one that was sending the comics, and it wasn't Mr. Batts. Mr. Batts' letter was actually already a violation of the directive, so it was going to be rejected no matter what." [Tr. 42]. When asked, "Would you still have rejected [the] cartoon if the letter from inmate Batts wasn't in [the envelope] at all?" he answered, "Yes." [Tr. 43].  Colon was then asked, hypothetically, if the cartoon and the Batts letter went out in the mail, would the recipient have been threatened by the cartoon, and he

answered yes. To the followup,  "Despite the fact that the letter said, 'please don't be threatened.'?",  Colon answered, "Doesn't matter." [Tr. 46-47].

Defendant Captain Marc Donahue

Defendant Marc Donahue was hired by the Department of Corrections in 1994 and held the position of Administrative Captain in the Intelligence Unit at Northern from 2005 to 2007. [Tr. 76]. In March 2007, he was a Disciplinary and Intelligence Coordinator, responsible for monitoring incoming and outgoing inmate correspondence, and the liaison between the Attorney General's Office and Northern. [Tr. 77]. Two correctional officers, defendant Colon and Officer Lovett, were assigned to the mail room in March 2007. [Tr. 78].  Donahue did not open and review mail; the two officers that reported to him, Colon and Lovett,  initially reviewed the mail. [Tr. 78]. The officers would bring any piece of mail they wanted to reject to Donahue for approval. [Tr. 79]. Donahue would review the decision and, if he wanted to reject the correspondence, he would present it to the Warden.  In March 2007, Jeffrey McGill was the Warden at Northern.  Donahue estimated that hundreds of pieces of incoming and outgoing mail were reviewed daily. [Tr. 77]. Inmates placed on mail review status had all of their incoming and outgoing mail opened and inspected. [Tr. 49-50].

Donahue testified he rejected Hunnicutt's outgoing envelope for several reasons: the cartoon was threatening in nature; the envelope contained another inmate's correspondence with

14

plaintiff's name on the return address; and the cartoon depicted an escape. [Tr. 79-82]. He agreed that the subject matter depicted in the cartoon was fictional but said that "any communication that goes outside of the prison that describes or depicts an escape, . . . should be rejected." [Tr. 82].

Donahue testified that Administrative Directive 10.7(E)(1)(i), "threats to the safety . . . of . . . the public," encompasses emotional harm. [Tr. 63-64]. "I related the emotional injury to 'threats.'" [Tr. 64]. When asked, "So the definition of 'threat' to you, is the definition of a 'threatening' piece of mail to you, a piece of mail that may have been intended to cause emotional harm?", he answered, "Yes." [Tr. 75]. "The reason I rejected it was I feel it may have been emotionally threatening to the recipient." [Tr. 61, 65, 68, 75]. Donahue agreed that the cartoon depicted consensual sex but believed that it could cause emotional injury to the recipient. [Tr. 65]. "I wasn't sure, but my job is to protect the public, and something so obscene, I know that personally, if a relative of mine, a female, a niece, received that, it would probably be very upsetting." [Tr. 61].

<u>Defendant Wayne Choinski</u>

Defendant Wayne Choinski was the District Administrator for the Northern Region of the Department of Corrections in March 2007, [Tr. 83], a position he held for three years before retiring. [Tr. 94]. He was employed by the State for approximately twenty-seven years. In his role as the District

15

Administrator, Choinski provided advice and assistance to the
wardens in his region. [Tr. 83-4].

Choinski was Warden at Northern from June 2003 until
February 2006 before his promotion to District Administrator.
[Tr. 94-95].  He testified that, "Northern houses all of the
security risk group threat members . . . all the gang members
that have been designated as a threat to the population or
been designated as having a leadership role are housed at
Northern." Along with inmates placed on Administrative
Segregation, "those inmates who the Department considers so
dangerous and so much of a threat to the general population that
they need to be housed in a separate facility, are housed at
Northern." [Tr. 94]. In "both the administrative segregation
program and the security risk group program . . . inmates go
through programming. So they have an opportunity to earn their
way out of Northern." [Tr. 95].

As District Administrator, Choinski reviewed Level II
grievance appeals, disciplinary appeals and correspondence
Choinski received from inmates at Northern, and he assisted the
warden by lending his experience and acting as a "sounding board"
for decisions. [Tr. 95]. He was asked, "Do inmates at Northern
pose any unique security or safety concerns vis-a-vis the
public?" He answered, "Absolutely. Over the years there's been a
number of attempts and, you know, some were successful, some were
not, of getting correspondence out of Northern that contained
gang hits on individuals, as well as information about staff that

16

has gone out, attempts to conspire with individuals on the
outside to commit crimes, that type of stuff." [Tr. 96]. Choinski
testified that Northern houses sex offenders, and the department
is concerned about sexually predatory behavior by inmates
"towards staff, other inmates, as well as inmates at Northern
sending items out that might end up going to a victim." [Tr. 96-
97]. He explained, "The primary mission of the Department is to
protect the public; secondly, to protect staff, and also, just as
important, to protect the inmates." [Tr. 97].

Warden McGill showed Hunnicutt's cartoon to Choinski in
March 2007 before plaintiff initiated a grievance. Choinski
agreed with the Warden that the cartoon shouldn't go out, based
on Administrative Directive 10.7. [Tr. 85]. Choinski testified at
his deposition that the kinds of offensive materials that would
not be allowed in outgoing mail included sexually explicit
materials, racially inflammatory materials or religiously
offensive materials. [Tr. 87]. Choinski explained, "It could be
materials that might inflame someone, maybe depicting someone of
a religious group or a sexual orientation, but most of what we
dealt with in corrections were sexually explicit, sexually
graphic, incoming and outgoing materials." [Tr. 88]. He testified
that he did not know whether Carnell Hunnicutt knew Jenny Boom-
Boom. He responded, "Absolutely," to the question, "But in this
case you would have rejected the cartoon if it was going out to
any person, man or woman in the entire world, not just Jenny
Boom-Boom, is that correct?"[Tr. 89]. Choinski testified at his

deposition that he "would have rejected [the cartoon] based on
the fact that you have cartoon characters with erect penes who
were ejaculating with a female. We just wouldn't let it out. We
wouldn't let it come in." [Tr. 90].

Choinski agreed that the cartoon does not portray non-
consensual sex. He thought the drawing depicted the artist's
sexual fantasy and that of his cellmate.  [Tr. 90-91]. Choinski
testified,

> I don't know, and I didn't know, and I still
> don't know if Mr. Hunnicutt or his cell
> partner knew the intended receiver, if they
> knew a person that worked in the -
> potentially in the mail room at that radio
> station.
>
> That cartoon was drawn, in my opinion, as Mr.
> Hunnicutt and his cell partner's - that was
> their fantasy.
>
> Certainly, to protect the receiver, male or
> female, in this case, female, from being
> offended and just being - feeling threatened
> by receiving - you have two convicted felons,
> convicted felons, Level V inmates at the
> State of Connecticut's highest security
> facility, what's referred to in the community
> as a "Supermax," who draw a cartoon of a
> woman who's receiving this envelope being
> ejaculated on, is offensive and it's
> threatening. And I can't imagine anyone in
> the general public receiving this and not
> feeling threatened and offended that, "Oh my
> God. These two inmates were able to get this
> out of Northern."
>
> It shows them - and the woman's not going to
> see it and say, "oh, yeah, well this is
> consensual sex."  It shows her being raped
> and sexually assaulted by two incarcerated
> inmates, regardless of, I suppose, whether at
> Northern or whether at a Level II facility.
>
> The woman's not going to interpret it as,
> "oh, this is just fun." you know, I can't

> assume that.  I have to assume, as the warden
> assumed, that she would receive it, be
> offended, and we're in essence, we're
> protecting her from that.

[Tr. 98-99].

Choinski testified that he handled the Level II grievance, or series of grievances, in reference to this cartoon. At his deposition he said, "The so-called cartoons are indeed threatening in nature. They are intended to frighten, demean, degrade and harass . . . and they create a sexually offensive and hostile working environment. All staff are involved in reviewing these materials. The DOC has a duty to protect the public from such offensive and threatening materials and confiscation of your materials furthers this legitimate public safety goal." [Tr. 92].

With regard to "mail review" status, Choinski said that Hunnicutt, "along with other inmates at Northern Correctional Institution, were subject to mail review, . . . I believe it's in the inmate handbooks that says they're subject to mail review, incoming and outgoing mail review, so he should assume, at any point, that his correspondence is subject to being reviewed." [Tr. 92]. "[A]ll inmates are subject to mail review. It's in our policy. That's . . . Administrative Directive 10.7. " [Tr. 93].

Choinski testified that when an inmate files a Level I Grievance, a counselor is in charge of correcting and researching all the facts, coming to a tentative conclusion and discussing the issue with the Warden. The Warden will look at the facts and recommendation and he makes the final decision. If denied at the facility level, an inmate can appeal to a Level II Grievance.  A

Level II Grievance is heard by the District Administrator.
Choinski has a counselor/supervisor obtain copies of the Level I
Grievance, obtain copies of all the information that the Level I
person gathered, and then also gather any additional information.
The person gathers facts and then sits with Choinski and
discusses whether to uphold, deny or reverse a lower level
decision and writing a response. [Tr. 101-02]. Choinski denied
Hunnicutt's Level II Grievance, concluding that,

> [t]he mail you attempted to send included a
> letter from another inmate, which is a
> violation of A.D. 10.7. The so-called
> cartoons are indeed threatening in nature.
> They are intended to frighten, demean,
> degrade and harass women, and they create a
> sexually offensive and hostile working
> environment for all staff who are involved in
> reviewing these materials.  The DOC has a
> duty to protect the public from such
> offensive and threatening materials and
> confiscation of your materials furthers this
> legitimate public safety goal.

[Pl. Ex. 14; Tr. 102].

Choinski testified that the fact that Batts' letter states
that "we don't mean to offend you in any way, shape or form we
are not sexually harassing you or stalking . . ." did not carry
any weight. Choinski stated that just because "they don't mean it
to be threatening . . . does not mean it's going to be
interpreted by the receiver as not threatening.  To send a
disclaimer with a sexually explicit, pornographic cartoon . . .
of the receiver basically being sexually assaulted, sending a
disclaimer does not make it all okay, no. Well there's a
disclaimer, they don't mean me no harm.  And anyway, add into

20

that they're two Level V offenders, convicted felons, in a
correctional institution." [Tr. 103].

Choinski testified that Administrative Directive 10.7,
"Outgoing general correspondence," fits within the definition of
threats to the safety or security of staff, other inmates or the
public. [Tr. 104]. "[T]o me [the cartoon] was threatening to the
receiver, who is certainly a member of the public." [Tr. 104].
When asked whether the discretion of the reviewing officer is
limited because the outgoing mail directive 10.7 (E)(1)(i) does
not specifically refer to materials that could cause emotional
injury, language that is included in the incoming mail directive
at 10.7(F)(1)(f), Choinski responded, "No . . . . Either way it's
a threat." [Tr. 104-05].

Choinski testified that he "did not know how the receiver
would interpret [this cartoon], and its quite likely that a
member of the public, receiving this cartoon from the offender
incarcerated in the state of Connecticut, would interpret it as-
and especially when it shows a likeness of them, that they would
interpret that they [are] being sexually assaulted, they [are]
being raped by two offenders." [Tr. 106]. He continued, "You have
to assume that a reasonable person is going to be offended by
it." [Tr. 106]. "The cartoon is the inmate's sexual fantasy.
Plaintiff drew the cartoon with everyone as a willing
participant, but this is Hunnicutt's sexual fantasy." [Tr. 107].

Administrative Directive 9.6(F), "Process Integrity,"
states, "The Unit Administrator shall ensure that no employee who

is the subject of an investigation shall investigate or participate in the resolution of an administrative remedy." [Pl. Ex. 6]. Choinski testified that he helped draft A.D. 9.6(F), stating that 9.6(F) does not involve review of a Level II grievance. In this case, no employee was the subject of an investigation. This was a grievance process, not an "investigation" under the DOC regulations, which is a separate process. Choinski stated that a fact finding took place that was relevant in making a determination on a grievance. [Tr. 109-10].

JEFFREY MCGILL

Defendant Jeffrey McGill was the Warden at Northern Correctional Institution in March 2007. Before retiring in 2009, McGill was employed by the Connecticut Department of Correction for twenty-two years. [Tr. 114-115].

McGill testified that Northern is the State's maximum security prison for male offenders. "[A]s the Level V maximum security prison, the inmates that came to Northern were on a type of program. There were five programs [at Northern] at the time. One was administrative segregation [t]hat housed the most dangerous and violent offenders in the state.  And then there was some level of programs, like security risk groups, chronic discipline, special needs, and death row. So with those five classifications, they were all extremely dangerous, so how we deal with the inmate population, security means, it was just, at all times, highly sensitive." [Tr. 134].

McGill testified that in his twenty-two years of experience

22

in the Department of Correction, he came across plans of escape "many times." Some of the escape plans were contained in outgoing mail from inmates. [Tr. 134-35].

McGill reviewed Hunnicutt's Level I Grievance and rejected it, determining that the cartoon was appropriately withheld from entering the outgoing mail. [Tr. 115]. McGill cited three reasons for his decision: "one being that there was a caption regarding escape. There was another factor where [the cartoon] included inmate correspondence from another inmate in the envelope, which is directly against department policy, and also that fact that I felt the cartoon and the caption was threatening in nature." [Tr. 115-16].

McGill agreed that a reasonable person would be offended by the cartoon and would find it threatening because of its nature, of what it said and how it said it. [Tr. 119-20]. McGill testified, "A reasonable person, to include myself, my staff who were reading it, and the people opening it, absolutely, and not to mention that there was an escape part in the cartoon also. That too." [Tr. 121]. When asked the hypothetical, "[i]f Mr. Hunnicutt wrote the letter and enclosed the cartoon in an envelope just like the envelope that's in evidence, would the package be properly rejected under the criteria you apply?" McGill answered,  "The entire enclosure, yes." [Tr. 122]. When asked, "Somebody writes a letter to a friend, and says, 'I know I'm not going anywhere, but I fantasize every day about escaping, just for a few hours.' Would you block that as an

23

unauthorized or illegal correspondence?",  McGill responded
"yes."  He agreed to the question, "So someone's not even allowed
to mention, in the way that I said, the thought of escaping,
correct?" [Tr. 123]. McGill further explained, "It depends how
it's worded, what the language is. If that word 'escape,' the
exact word 'escape' was in the . . . was written, I would take
that very seriously and look at rejecting it, yes." [Tr. 124].
Question, "Even if it's clearly not an expression of an intention
to escape, but simply an expression of a fantasy that may be very
common?" Answer, "In my experience, and especially in my time at
Northern Correctional Institution, I would never take it for
granted, and I'd take it very serious, regardless of how it's
expressed." [Tr. 124].

Setting aside the escape piece, McGill was asked whether he
agreed that the "sex was described [] as being consensual?"
McGill answered,  "By the author, yes. I felt it threatening. By
reviewing it myself, I felt it threatening, and my staff did
also, and that's based on the content and my perception that it
was threatening in nature." [Tr. 125]. When asked, "And the
intent that you saw expressed in the cartoon, was to inflict harm
on the recipient [radio personality], correct?", he answered,
"yes." [Tr. 124].McGill testified that, "It didn't appear that
the woman [in the cartoon], in fact, was depicted as being in
charge of what was going on." [Tr. 127]..."The reason [the
cartoon] was rejected, [was] because I perceived it to be
threatening. So to answer this question, if it was perceived to

24

be threatening, yes, then it would be rejected." [Tr. 129].

McGill agreed with Choinski's testimony that the cartoon was offensive but responded, "No, not necessarily," when asked if that was enough to keep it from being sent out. [Tr. 130]. "[I]t would have to be threatening as well?" Answer, "Correct." [Tr. 131].

McGill also said that he "absolutely takes escape seriously, no matter how fantastical or improbable or imaginary the discussion.[Tr. 132]. In response to the question, "[W]hy is just even a fantasy or mention of escape a concern to an experienced prison official [for] a correctional warden at a Level V facility like Northern?", he replied, "[I]n my 22 years I spent . . . I was at five correctional facilities, and not to say that it's not the highest of priorities at any correctional facility, but yes, being at the maximum security prison with that type of inmate, and that security level . . . was a heightened concern." [Tr. 135]. McGill stated that plans of escape often involve confederates or co-conspirators who are civilians outside of the prison and outgoing mail is a means to communicate. [Tr. 135].

On cross examination, McGill explained that he thought the cartoon was threatening and so did his staff.  Hunnicutt has drawn cartoons of female staff members before and they felt harassed. [Tr. 137].  McGill factored that into weighing whether or not someone receiving the Jenny Boom-Boom cartoon, Pl. Ex. 1, would feel harassed or threatened. [Tr. 137-38].  To the question, "Was it your understanding from reviewing the cartoon,

25

that the female figure, especially that is depicted in the nude, and it looks like [she is] being sodomized, is it your understanding that that was supposed to be the addressee on the letter, Jenny Boom-Boom? That's a depiction of her?", he answered, "That is what I assumed." [Tr. 139].

McGill stated that he was also concerned about other people at Jenny Boom-Boom's workplace handling the incoming mail, a mail person or secretary. He was concerned the cartoon may be jarring, shocking, and threatening.  "Like I said before . . . my staff felt threatened when they received the letter. So anybody that opened that letter would have the possibility of [feeling] threatened . . . ." [Tr. 140]. McGill did not agree with Batts' statement that they are "both very respectful men;" he did not believe that the cartoon was a respectful display of the treatment of women and he had no reason to believe that Jenny Boom-Boom consented to the receipt of the letter and cartoon. [Tr. 141].

McGill testified that the mission of the DOC is to protect the public, "first and foremost;" DOC staff and the inmates. [Tr. 142].  He stated that the decision to reject Hunnicutt's mailing followed proper chain of command and Administrative Directive 10.7. Colon appropriately brought the mailing to Captain Donahue for review. McGill agreed with Captain Donahue's assessment that the cartoon was threatening in nature. McGill would have disagreed with a decision to permit this correspondence to be mailed. [Tr. 143].

26

McGill understood that the cartoon was confiscated so that
Hunnicutt would not send it out, with or without a letter from
Batts. He thought the confiscation was reasonable.[Tr. 145].
McGill stated, "[S]omeone that opened this letter, whether it was
my staff, a secretary or the intended recipient, whoever opened
that, and they started reading the captions of this cartoon, and
they see right away that there [are] two inmates going to escape
to come do something, as it is depicted, and then as it goes
further on and they see what's mentioned in those captions, that
would definitely instill fear in a reasonable person." [Tr. 147-
48]. He thought that, "the entire . . . almost every caption in
that cartoon was threatening in nature,  . . . virtually the
entire thing would have to be changed" to make it nonthreatening.
[Tr. 147].  Almost all of the cartoon constituted a threat. [Tr.
148].

Plaintiff Carnell Hunnicutt

    Plaintiff Carnell Hunnicutt is an inmate at Northern
Correctional Institution and was incarcerated there in March
2007.  Willie Batts was his cell mate at that time and together
they would listen to radio station 93.7. [Tr. 150].

    Hunnicutt recalled listening to radio personality Jenny
Boom-Boom's radio show, stating she made sexual comments, talked
about her former sexual experiences and discussed different
musical stars she would like to have sex with. He stated she did
this in a humorous manner.  Hunnicutt said that Batts "put it
[his] head. He told me that, 'Hey, you ought to do a cartoon for

27

[Jenny Boom-Boom] and we'll send it to her.' I thought, 'Well you know, she's kind of wild on the radio, so why not?'" [Tr. 151].

Hunnicutt testified that Batts drafted a letter to go along with the cartoon.  Plaintiff placed Batts's letter and the cartoon in an envelope and put it in the door for an officer to pick up and place in the outgoing mail box. [Pl. Ex. 1, 2, 3]. Hunnicutt stated he was unaware at that time that he had been placed on mail review status. [Tr. 152]. Hunnicutt received a rejection notice from Officer Colon, stating that the "content is rejected under A.D. 10.7. Drawings are threatening in nature. I/M also violating 10.7 by sending a letter from I/M Batts . . . Free postage envelopes must contain[] letters from the approved indigent inmate." [Pl. Ex. 4; Tr. 153].

Hunnicutt testified that he did not understand Officer Colon's rejection notice "because it didn't fall under criteria of threatening, [be]cause it contained no threats, and I did not receive a [disciplinary report] as per 9.5 for threats. So I thought it was bogus on face value, and I charged . . . I appealed it." The cartoon "wasn't to threaten anyone . . . That's what I do. I do cartoons for humorous purposes."  [Tr. 153-54; Pl. Ex. 1]. Hunnicutt testified, "The scenario is we meet Jenny Boom-Boom in the club.  She asks us a couple questions, and the next thing you know, one thing leads to another, which she basically initiates, and we just follow her lead." [Tr. 154]. Plaintiff stated he depicted Jenny Boom-Boom as the most powerful

28

person in the cartoon. He based her likeness "on an R. Crumb[5] type
character, big Amazonian-type woman wearing leather . . . . And
she's in control and she's basically initiating things."
Hunnicutt portrayed himself as slobbering like a dog, having a
heart attack, and at the end returning to Northern by count time.
[Tr. 155-56].  "At count time you just gotta be in your cell."
[Tr. 156].

     After Hunnicutt received a rejection notice for the March 16
mailing, he first filed an inmate request to both Major Rodriguez
[Pl. Ex. 17] and Warden McGill. [Pl. Ex. 18]. "This is me asking
about my outgoing mail being censored and reviewed, and not going
out in a timely manner." [Tr. 157].  Major Rodriguez responded,
"According to Administrative Directive 10.7, Inmate
Communications, 'All outgoing general correspondence shall be
subject to being read at the direction of the Unit
Administrator.'" [Pl. Ex. 17]. Hunnicutt stated that, "It was my
understanding [Major Rodriguez] was the mail room supervisor, or
he had something to do with the mail room." [Tr. 157].  Hunnicutt
wrote,

          Major Rodriguez, Why is my outgoing mail
          being reviewed/censored and not going out in
          a timely manner?  Under Procunier v. Martinez
          you have no right to censor my mail going out
          to the public/public representatives.  The
          last time you did this this ended up in Court
          with me proving you wrong.  Do we have to go

_____

     [5]"Robert Dennis Crumb (born August 30, 1943)-known as Robert
Crumb and R. Crumb-is an American artist, illustrator, and
musician recognized for the distinctive style of his drawings and
his critical, satirical, subversive view of the American
mainstream." http://en.wikipedia.org/wiki/Robert_Crumb

through this again? And what reasons do you
have for disrupting my mail? Am I high
security or SRG? Answer these questions. I'm
a Level 4 prisoner-How do you justify
tampering with my mail?

[Pl. Ex. 17].

Hunnicutt's Inmate Request dated March 21, 2007 to Warden
McGill states, "I'm inquiring as to why my outgoing mail is being
delaying in mailing out and certain letters being withheld for 15
days before being returned. I wrote Captain Donahue and
specifically asked, 'Am I on mail review, and if so, why?' And no
answer was given.  He did write that, '[a]ll general
correspondence shall be subject to being reviewed at the
direction of the Unit Administrator.'  Is this your doing? Did
you place me on mail review? I'd like an answer." [Pl. Ex. 18].
Warden McGill responded on March 27,  "All mail is handled in
accordance with Dept. policy. I checked with our mail room and
all mail is being processed without delay." [Pl. Ex. 18; Tr. 168-
69].

After receiving these responses, Hunnicutt initiated the
grievance procedure and his grievance was denied. [Tr. 161-62].
Hunnicutt testified that Colon told him that the cartoon was
confiscated and would not be returned. [Tr. 162].
Hunnicutt drew the likeness of Jenny Boom-Boom "basically from a
description . . . that guys described her as, with my own spin, a
long spin to it." [Tr. 162].  "I sent [Jenny Boom-Boom] a
birthday card that I did a lot of cards for other guys who, on a
regular basis, send her . . . birthday cards.  And so that's how

I know [what] she look[s] like, the way they describe her with
the blond hair, big bust, things of that . . . you know, they
describe her anatomy and everything to me. And I only sent her
like one card." "Other guys would pay me to draw the cards and I
would make the cards, and they [would] send them out in their
names." [Tr. 164].

Hunnicutt testified that the cartoon was confiscated in
March 2007 and no one from the prison has indicated that they
might let him send it out in the future. [Tr. 164]. "And do you
think you could send [the cartoon] out now, without any problem?
Answer, "I would not try because I thought it was pretty drawn.
I've never looked at it . . . but I think I would do a better job
now." [Tr. 165]. "And what is your perception of whether the
prison would let you send it out?" Answer, "I don't think they
would because they think that [unintelligible] and they're more
corrupt and criminal then I could ever be." [Tr. 165].

Hunnicutt stated that he sent Jenny Boom-Boom a birthday
card prior to mailing the March 16 cartoon. In the birthday card,
Hunnicutt drew her with clothes on and she was not having sex and
he was not depicted in the drawing. [Tr. 166]. Hunnicutt believed
that the cartoon was humorous and that Jenny Boom-Boom might be
flattered that she was well drawn. [Tr. 167].

Hunnicutt drew the cartoon at issue in this case. Mr. Batts
wrote the letter. Hunnicutt filled out an envelope and made some
drawings on the front, assembled the cartoon and the letter and
placed them inside the envelope. [Tr. 169]. The envelope and the

postage for the envelope were free to Hunnicutt because he was indigent at the time. [Tr. 169-70; See Pl. Ex. 5, Administrative Directive 10.7(D)].  He admitted knowing at the time that sending this envelope was a violation of the Administrative Directives. [Tr. 170].

Hunnicutt was asked, "You would agree with me that because you violated the Administrative Directives by including the mail-a letter from another inmate in your envelope, the mail was properly withheld by DOC?" He answered, "That's a Catch-22. Yes and no." "'No' because mail going to the media is not supposed to be opened.  'Yes' because there was a letter contained by another inmate." To the followup question, "So if I understand you correctly, you don't believe that the Department of Correction ever should have even opened this letter in the first place?", he replied,  "No, had no reason to." [Tr. 171].

Hunnicutt never met Jenny Boom-Boom and had had no direct communication with her. "Only sent her a birthday card. That was it." [Tr. 171-72].

## II.  CONCLUSIONS OF LAW

This case was pled, extensively briefed and passionately argued as a freedom of speech/First Amendment action. But on the evidence presented, it turns on the more prosaic but still important issues of prison regulation. Did the defendants lawfully prevent plaintiff from mailing the letter at issue? And once they did so, could they lawfully refuse to return it to plaintiff?

32

The answers are "yes" and "yes."  This leaves to another day
the question of whether prison officials may protect the public
by screening and refusing to mail a cartoon that officials
reasonably believe will frighten or make a recipient feel
threatened.

A.   Rejection of Plaintiff's Outgoing Mail

Defendants' inspection and rejection of Hunnicutt's
correspondence, dated March 16, 2007, did not violate plaintiff's
First Amendment rights. [Pl. Ex. 1, 2, 3]. Plaintiff acknowledged
that he was on mail review status in March 2007 and,
consequently, his incoming and outgoing correspondence was
subject to inspection. Indeed, plaintiff does not challenge
Administrative Directive 10.7(E)(1), which permits review,
inspection and rejection of outgoing mail.  Wolff v. McDonnell,
418 U.S. 539, 576 (1974) (noting that "freedom from censorship is
not equivalent to freedom from inspection or perusal"); Sostre
v. McGinnis, 442 F.2d 178, 200 (2d Cir. 1971) ("Discipline and
prison order are sufficient interests to justify . . . regulation
[of unauthorized correspondence] incidental to the content of
prisoners' speech."); Martin v. Brewer, 830 F.2d 76, 77 (7th Cir.
1987) (inmates have no generalized First Amendment right
preventing prison staff from opening and reading mail); Gaines v.
Lane, 790 F.2d 1299, 1304 (7th Cir. 1986) (upholding prison
regulation that allowed nonprivileged, outgoing mail to be opened
and inspected); Therrien v. Martin, No. 3:07CV1285(JCH), 2007 WL

33

312181, *3 (D. Conn. Oct. 19, 2007) ("While the Supreme Court has afforded special protections to an inmate's legal mail, it never has held that the First Amendment prevents correctional staff from reading prisoners' non-legal mail.").

Plaintiff conceded at trial that defendants had a legitimate basis, pursuant to Administrative Directive 10.7(E)(1)(h), to reject his correspondence because the mailing included a letter from inmate Batts.[6]  In this action, plaintiff does not challenge the administrative directive or contend that it was improperly applied. "The opening and inspecting of [plaintiff's] outgoing mail is reasonably related to the legitimate penological interest of institutional security." See, e.g., Altizer v. Deeds, 191 F.3d 540, 547-48 (4th Cir. 1999) (stating that if inmates' outgoing mail could not be opened and inspected, "a prison official would never know that a letter contained the very type of material that, according to the Supreme Court, could rightfully be censored, i.e., correspondence sent by an inmate that would be detrimental to the security, good order, or discipline of the institution; necessary for the protection of the public; or used to facilitate criminal activity"); Smith v. Delo, 995 F.2d 827, 830 (8th Cir. 1993) (holding that "[a]lthough there is less of a security risk with outgoing mail precisely because the mail is going out of the prison, there is also no doubt that prison officials are justified in discovering and refusing to process

---

[6]Plaintiff testified that when he placed the cartoon with Batts's letter into the envelope, he understood that he was violating Administrative Directive 1.7(E)(1)(h).  (Tr. 169-70).

mail that contains" "escape plans, contraband, threats, or evidence of illegal activity") (emphasis added).

The legitimate need to screen outgoing mail for such content also justifies an administrative directive that requires inmates to send mail under their own names rather than in envelopes identified with other prisoners.

Accordingly, the Court finds that the inspection of the March 16, 2007, correspondence does not rise to a violation of plaintiff's First Amendment rights.  See Caldwell v. Beard, 305 Fed. Appx. 1 (3rd Cir. Dec. 28, 2008) ("[W]e agree that prison employees did not violate [plaintiff's] constitutional rights by inspecting his outgoing nonprivileged mail"). Regardless of the cartoon content, the mailing violated the Administrative Directive prohibiting mailing of another inmate's correspondence, and could be properly confiscated.


B.   Retention of the Cartoon

Having found that confiscation of the March 16, 2007, mailing did not rise to a First Amendment violation, the next question for the Court is whether the retention of the cartoon violated plaintiff's First Amendment rights.

Defendants argue that the decision not to return the cartoon to plaintiff was "reasonably related" to legitimate penological objectives. Turner v. Safely, 482 U.S. 78, 89 (1987) (holding that restrictions on inmate-to-inmate communications pass constitutional muster only if the restrictions are reasonably

related to legitimate and neutral governmental objectives.); Shaw
v. Murphy, 532 U.S. 223, 229 (2001) (The judiciary is "ill
equipped" to administer and regulate the day-to-day activities of
penal institutions); Overton v. Bazzetta, 539 U.S. 126, 132
(2003) ("We must accord substantial deference to the professional
judgment of prison administrators, who bear a significant
responsibility for defining the legitimate goals of a corrections
system and for determining the most appropriate means to
accomplish them."); Thornburgh v. Abbott, 490 U.S. 401, 416
(1989) (Court deference to decisions of prison officials is
warranted where prison officials have provided individualized
review of the banned items).

Defendants contend that plaintiff was not entitled to keep
his cartoon because it depicted both an escape and sexually
explicit acts on a member of the public.

In deciding to keep the cartoon, Warden McGill factored into
his decision not only that he found the cartoon threatening, but
so did his staff. McGill testified that on a prior occasion,
Hunnicutt drew female staff members and they felt harassed.[7] [Tr.
137-38]. See  Hunnicutt v. Faneuff, CV000803077, 2001 Conn.
Super. LEXIS 3603, *6 (Conn Super. Dec. 14, 2001) (holding
"[m]easures aimed at preventing the plaintiff, or any other

---

The DOC's Mission Statement reads, "The Department of Correction
shall protect the public, the staff, and provide safe, secure,
and humane supervision of offenders with opportunities that
support successful reintegration.  See
http://www.ct.gov/dof/LIB/doc/PDF/Workbook/wb00Mission.pdf; see
also, http://www.ct.gov/doc/site/default.asp

inmate, from drawing and maintaining material depicting him
performing violent and sexually explicit acts on corrections
employees is rationally related to reasonable objectives of
prison administration, namely the preservation of the safety of
corrections employees and suppressing or repressing an inmate's
violent and sexually abusive ideation.").

In Hunnicutt v. Faneuff, Judge Bryant found that

> restricting the plaintiff's right to produce
> and maintain [sexually explicit] material
> does not impermissibl[y] restrict his First
> Amendment speech rights. The reasonableness
> of corrections views of the detrimental
> effects of the plaintiff's speech is
> inescapable and are sufficiently compelling
> to outweigh and prevail against plaintiff's
> First Amendment associational rights.

2001 Conn. Super. LEXIS 3603, *6.  In Hunnicutt v. Faneuff,
plaintiff argued that he "should not be denied the right to his
drawings because other inmates were allowed to have pornographic
material." 2001 Conn. Super. LEXIS 3603, *6. Judge Bryant found a
"rational basis for distinguishing between the disruptive and
dangerous effects of violent and sexually explicit material
published by the media depicting willing professional models and
actors on the one hand and violent and sexually explicit material
drawn by the plaintiff depicting corrections employees being
subjected to fictional sexually explicit and violent acts
committed by the plaintiff on another." 2001 Conn. Super. LEXIS
3603, *6-7. While the cartoon here did not purport to feature
correctional employees, it featured a purportedly specific real
person, a member of the public, being subjected to the

plaintiffs' sexual fantasies.

Plaintiff argues that the initial decision to confiscate the mailing resulted in a rolling First Amendment violation because the confiscation stopped plaintiff from re-mailing the cartoon. However, once the cartoon was discovered in the outgoing mail and reviewed by defendants, the decision to retain the cartoon was discretionary and motivated by internal prison management safety and security concerns. The Court has carefully reviewed Warden McGill's testimony and that of defendants Choinski and Donahue, and finds defendants' decision to retain the cartoon warrants judicial deference to the correctional officials' expertise and penological goals.  Here, deference to the defendants' decision is particularly appropriate because it was based on their long and varied experience as correctional officials and buttressed by concrete examples of how restricting prisoners' retention of sexually explicit materials, specifically sexually explicit materials depicting an escape drawn by Hunnicutt, is related to protecting the public "and humane supervision of offenders . . . that support successful reintegration." See Hunnicutt v. Faneuff, CV000803077, 2001 Conn. Super. LEXIS 3603, *6-7 (Conn. Super. Dec. 14, 2001). Plaintiff's cartoon depicts, among other things, two escaped inmates ejaculating on a female, and engaging in oral, vaginal, and anal sex. See Moses v. Dennehy, 523 F. Supp. 57, (D. Mass. 2007) ("The use of sexually explicit material in the course of a sexual assault demonstrates that such material impairs the security of the prison."), aff'd, Josselyn v.

38

Dennehy, No. 08-1095, 333 Fed. Appx. 581, 2009 WL 1587695 (1st Cir. 2009). Defendants' interest in prohibiting the possession of a sexually explicit cartoon depicting an escape is a legitimate penological concern.  This interest is  "not related solely to the suppression of expression and [is] neutral on [its] face." Id.

Finally, and most importantly, the depiction of an escape is a matter that defendants take very seriously in maintaining internal security and order at the prison. The decision to retain the cartoon on this basis is logically related to legitimate security concerns of prison officials, who testified that escape is always taken seriously and it is of no matter whether the depiction of the escape is fantasy.[8] In light of that testimony,

---

[8]McGill was asked, "Somebody writes a letter to a friend, and says, 'I know I'm not going anywhere, but I fantasize every day about escaping, just for a few hours.' Would you block that as an unauthorized or illegal correspondence?"  McGill responded "yes." Question, "So someone's not even allowed to mention, in the way that I said, the thought of escaping, correct?" Answer, "yes." [Tr. 123].  McGill further explained, "It depends how it's worded, what the language is. If that word 'escape,' the exact word 'escape' was in the . . . was written, I would take that very seriously and look at rejecting it, yes." [Tr. 124]. Question, "Even if it's clearly not an expression of an intention to escape, but simply an expression of a fantasy that may be very common?"  He responded, "In my experience, and especially in my time at Northern Correctional Institution, I would never take it for granted, and I'd take it very serious, regardless of how it's expressed." [Tr. 124].  Question, "[I]s it your approach that you take [escape] seriously, no matter how fantastical or improbable or imaginary the discussion is?" Answer, "Absolutely." [Tr. 132]. Question, "[W]hy is just even a fantasy or mention of escape a concern to an experienced prison official [for] a correctional warden at a Level V facility at Northern?" Answer, "[I]n my 22 years I spent . . . I was at five correctional facilities, and not to say that it's not the highest of priorities at any correctional facility, but yes, being at the maximum security prison with that type of inmate, and that security level . . .

defendants are entitled to deference on the basis of internal safety and security concerns at the prison.   Smith v. Delo, 995 F.2d 827, 830 (8th Cir. 1993) (holding that prison officials "have a strong interest in preventing, deterring, and discovering escape plans.").  "The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions."[9]  Hunter v. Palmer, 468 U.S. 517, 526 (1984).

    Accordingly, the decision to retain the cartoon was rationally related to reasonable objectives of prison administration in maintaining safety and security within the prison. Moreover, given the prior decision in Hunnicutt v. Faneuff, CV000803077, 2001 Conn. Super. LEXIS 3603 (Conn. Super. Dec. 14, 2001), there was no basis for prison officials to

---

was a heightened concern." [Tr. 135]. McGill stated that plans of escape often involve confederates or co-conspirators who are civilians outside of the prison and outgoing mail is a means to communicate. [Tr. 135].

    Donahue testified that although he agreed that the subject matter depicted in the cartoon was fictional, "any communication that goes outside of the prison that describes or depicts an escape . . . should be rejected." [Tr. 82].

    [9] The Supreme Court noted in Hunter v. Palmer that "Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others." 468 U.S. at 526.

conclude that confiscation of this cartoon was a violation of any of Mr. Hunnicutt's constitutional rights.

C.   Ripeness

As set forth above, the Court is unable to determine the merits of plaintiff's underlying First Amendment claim because that claim is not ripe. Thomas v. Union Carbide Agr, Products Co, 473 U.S. 568, 579 (1985) (plaintiff must "demonstrate[] sufficient ripeness to establish a concrete case or controversy").

Ripeness is a justiciability doctrine concerned with the timing of a lawsuit. Thomas, 473 U.S. at 579-80(citation omitted). The "basic rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977). A matter "is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (quotation marks omitted). "[D]etermining whether a dispute is ripe for review requires a two-pronged analysis of (1) whether the issues presented to the district court are fit for review, and (2) what hardship the parties will suffer in the absence of review. Connecticut v. Duncan, 612 F.3d 107, 113 (2d Cir. 2010) (citing Abbott Labs, 387 U.S. at 148-49). As the Supreme Court

has explained, the ripeness doctrine's "basic rationale is to
prevent the courts, through avoidance of premature adjudication,
from entangling themselves in abstract disagreements."
consideration." Abbott Labs., 387 U.S. at 148. "The 'fitness of
the issues for judicial decision' prong recognizes the restraints
Article III places on federal courts. It requires a weighing of
the sensitivity of the issues presented and whether there exists
a need for further factual development. Meanwhile, the 'hardship
to the parties prong clearly injects prudential considerations
into the mix, requiring us to gauge the risk and severity of
injury to a party that will result if the exercise of
jurisdiction is declined." Murphy v. New Milford Zoning Comm'n,
402 F.3d 342, 347 (2d Cir. 2005)(internal citations omitted).
Our Circuit Court has "repeatedly observed that, 'when a court
declares that a case is not prudentially ripe, it means that the
case will be better decided later . . . . [not] that the case is
not a real or concrete dispute affecting cognizable current
concerns of the parties.'" Duncan, 612 F.3d at 114 (quoting New
York Civil Liberties Union v. Grandeau, 528 F.3d 122, 131 (2d
Cir. 2008)).[10]

_____

[10]The Declaratory Judgment Act, in turn, provides a statutory
basis for granting declaratory relief "[i]n a case of actual
controversy within its jurisdiction." 28 U.S.C. § 2201(a).
Upholding the constitutionality of the Act, the Supreme Court
distinguished between "a real and substantial controversy
admitting of specific relief through a decree of a conclusive
character" and "an opinion advising what the law would be upon a
hypothetical state of facts," and ultimately concluded:

        Where there is such a concrete case admitting
        of an immediate and definitive determination

Plaintiff's assertion of a First Amendment violation is an issue "not ripe for adjudication as it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. at 300. It is not contested that defendants confiscated the cartoon and letter to prevent Hunnicutt from mailing it. The Court has found that there was a legitimate basis for that decision because the mailing contained an unauthorized letter from inmate Batts. Because the cartoon was not returned to plaintiff, it is also not contested that the cartoon was not again posted for the outgoing mail or rejected by defendants, a contingent future event that did "not occur at all." Texas v. United States, 523 U.S. at 300.

Plaintiff's counsel asserts that if the cartoon were returned to Hunnicutt in a timely manner,  he would have mailed it out immediately. However, this was not a subject of

_____

of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages.

Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937). Jurisdiction over a declaratory-judgment action may exist despite the underlying basis of liability being contingent, but in assessing its jurisdiction a court "should focus on 'the practical likelihood that the contingencies will occur.' " Associated Indem. Corp. v. Fairchild Indus., Inc., 961 F.2d 32, 35 (2d Cir. 1992) (quoting 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2757, at 587 (2d ed. 1983)). Furthermore, district courts have discretion "to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003).

plaintiff's testimony at trial. At trial, plaintiff was asked, "And do you think you could sent [the cartoon] out now, without any problem?" Answer, "I would not try . . . ." [Tr. 165]. Clearly, nothing prevented plaintiff from drawing another cartoon and posting it in the outgoing mail while the grievances were pending. See Texas v. United States, 523 U.S. 296, 300 (1998) ("A matter "is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."). (quotation marks omitted). Indeed, at oral argument, plaintiff's counsel conceded that at some point the cartoon aged and it is now no longer possible to send the cartoon in the context of responding to one particular radio show.

Plaintiff has not shown hardship in the absence of review. Plaintiff has not asserted that all of his outgoing mail containing cartoon images has been rejected from the outgoing mail since March 2007. Any argument that his future efforts to include a cartoon in the outgoing mail will be thwarted by defendants is conjectural/hypothetical and would require review of the yet-to-be drawn cartoon on a case by case basis.

Based on the foregoing, the constitutional challenge as presented by plaintiff is not fit for judicial review for lack of ripeness.

44

CONCLUSION

    Accordingly, judgment is entered in favor of defendants on all counts.

    This is not a recommended ruling.  The parties consented to proceed before a United States Magistrate Judge [Doc. #79] on May 11, 2010, with appeal to the Court of Appeals.

    SO ORDERED at Bridgeport this 30th day of September, 2012.


_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE